**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> v. <br><br> **PAUL MODRELL,** <br><br> **Defendant.** | **Crim. Action No. 23-CR-00001 (BAH)** |

**MEMORANDUM IN AID OF SENTENCING**

Mr. Paul Modrell will be before the Court for sentencing on October 20, 2023 after having accepted responsibility for Parading, Demonstrating, or Picketing in a Capitol Building on January 6, 2021, in violation of 18 U.S.C.§ 40 U.S.C. 5104(e)(2)(G).

Mr. Modrell, a devoted husband, father, and civil servant, took responsibility at the earliest possible opportunity for his decisions and actions on January 6th. After his self-surrender to authorities, Mr. Modrell gave a voluntary interview with FBI investigators, in which he was cooperative and honest about his actions and what he witnessed that day. While inside the Capitol, Mr. Modrell did not encourage or engage in any violence or property destruction of any kind, nor did he go into any sensitive areas within the Capitol. Rather, he traveled on the Metro to the Capitol from his home in Columbia, Maryland in order to witness former President Trump's speech, and made the regrettable decision to follow the crowd into the Capitol that day. Mr. Modrell did not bring a weapon of any kind to Washington, D.C., nor does the Government allege he made any inflammatory statements in person or on social media justifying his conduct. Furthermore, Mr. Modrell has no prior criminal history whatsoever beyond a single traffic-related citation.

Contrary to the Government's suggestions, the story of Mr. Modrell's life beyond that day demonstrates that his decision to follow the crowd into the Capitol that day was a true aberration. Indeed, Mr. Modrell has been described by his wife of 32 years and by others who know him well as an industrious, respectful, family-oriented man who is committed to building a strong and united family—one which he was not fortunate to have when he was a child. Mr. Modrell enlisted in the U.S. Navy as a young man in order to serve his country, working as a hospital medic during his time in the U.S. and abroad. Following his honorable discharge, Mr. Modrell worked to obtain first his bachelor's degree, and later his Master's degree, all while working fulltime to support his family. Mr. Modrell has been employed as a landscape architect, environmental engineer and civil servant for decades in Oakland, California and now closeby in Maryland. He has been married to his wife for over 32 years, and together they have raised three children, now teenagers who are thriving –and whose lives would be irrevocably altered by Mr. Modrell's incarceration.

For the foregoing reasons, Mr. Modrell, through counsel, respectfully requests that the Court follow U.S. Probation's recommendation to impose a sentence of probation in this case, which is a sufficient punishment that fairly reflects Mr. Modrell's lack of criminal history, his unlikelihood of recidivism, and aberrant conduct in this case.

I.  **Procedural History**

Mr. Modrell self-surrendered to the FBI in Baltimore, Maryland on December 20, 2022, whereupon he willingly turned over his phone and participated in a voluntary interview with the FBI in which he identified himself in photos and admitted his presence at the Capitol on January 6, 2021. When Counsel met with him in the lockup later that day, Mr. Modrell was contrite and prepared to accept responsibility for his actions. He was presented on the four misdemeanor charges, and released on his own personal recognizance.

On January 3, 2023, the Government filed a four count Information in this case, on which Mr. Modrell was arraigned before this Court on January 6, 2023. On June 2, 2023, Mr. Modrell entered a plea of guilty to one count of Parading, Picketing or Demonstrating in a Capitol Building on January 6, 2021, in violation of 18 U.S.C.§ 40 U.S.C. 5104(e)(2)(G).

Mr. Modrell has complied with his conditions of release for the last ten months, with the exception of two missed phone check-ins with pretrial services. Mr. Modrell also promptly complied with the Court's requirement to surrender all firearms and provided proof of the same to Pretrial Services. He has not incurred any rearrests or any other violations in the preceding ten months. He also fully cooperated with the Presentence Report interview process, signing all applicable releases and provided all required information promptly.

Sentencing in currently set in this case for October 20, 2023.

**II.     Legal Standard**

In determining a sentence, courts must impose the least amount of imprisonment necessary to accomplish the purposes set forth in § 3553. 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary . . ." (emphasis added)). As the charge to which Mr. Modrell pled guilty to is considered a petty offense, the U.S. Sentencing Guidelines are considered not to apply.

**A. The Sentencing Factors Applied to Mr. Modrell Demonstrate that a Probationary Sentence is Sufficient but No Greater than Necessary to Achieve the Goals of Sentencing.**

**i.     Mr. Modrell's History and Characteristics Support a Sentence of Probation.**

As described above and in the PSR, Mr. Modrell has a history of honorable service to his country and his community throughout his adult life. Indeed, Mr. Modrell's wife of 32 years describes him as an "I'm going to help everybody" kind of guy, with a calm temperament, who is attentive to his children, to her family, to the environment, and to her. She has further expressed

4

that his actions on January 6th are deeply out of character for him – as described in further detail below.

Paul Modrell grew up in a lower middle class family in Oakland, California. He grew up without knowing his biological father, and was raised by his mother and later his stepfather starting at the age of two. The family at times struggled to make ends meet, with his stepfather working as a school bus driver and his mom taking on odd jobs to pay the bills. Paul remembers his mother was often working to try to keep food on the table while he looked after his half-brother, 4 years his junior. He felt a longing from a young age to one day have his own family, be a committed father, and give his children every opportunity he could to thrive.

With these goals in mind, Mr. Modrell chose to enroll in the U.S. Navy shortly after graduating high school in California, in order to give back to his country and community—an ethos he has carried with him as he later pursued a career as a civil servant. While in the Navy, he received training as a hospital medic in the reserves before transitioning to active duty, where he was stationed in Camp Pendleton and Treasure Island, California, and later deployed abroad to Okinawa, Japan. It was during his military service that he met and married his now wife of 32 years.

After his honorable discharge from the Navy, Mr. Modrell pursued his Bachelor's Degree in Environmental Studies at the University of California-East Bay, later returning to school to obtain a certificate in landscape architecture through the Extension Program at the University of California – Berkeley. Throughout his pursuit of higher education, Mr. Modrell worked fulltime in various municipal environmental and landscape architecture positions in order to support his wife and growing family. They would come to welcome three children, now teenagers ranging in age from 14 to 19 years old. Mr. Modrell later returned to pursue his Master's in Science Degree in environmental management at the University of San Francisco when his children were quite

young in order to improve employment opportunities and better support his young family.

Despite his persistence in obtaining his Master's degree while maintaining full time work as a municipal engineer, Mr. Modrell still struggled to keep up with the skyrocketing cost of living in Oakland, California. It became more and more clear that remaining in Oakland was quickly becoming untenable for their middle class family, with estimates now suggesting that the cost of living there is 46% higher than the national average. ███████████████████████
████████████████████████████████████████████████████████████
███████████
    ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████
    ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ It was after this period in the

summer of 2019 that the family ultimately decided to relocate to Maryland, where his wife's parents and family lives and where they could live more affordably.

Particularly because he grew up without his own biological father by his side, Mr. Modrell has consciously dedicated his life to creating a strong, loving family environment for his own children. As a result of his commitment to forming a stable home, their children are thriving. Currently, their oldest child is studying at the local community college and planning to transition to the University of Maryland in the coming year. Their middle child, while still in high school, is primarily taking junior college classes to obtain college credit. Their youngest child receives an IEP for assistance with learning-related challenges, but is thriving socially and otherwise doing well. In this context, Mr. Modrell is deeply pained and remorseful that his actions could bring shame and suffering to his wife and children, particularly after decades of working hard to serve both his family and country.

As is clear, Mr. Modrell experienced significant loss and grief during a particularly challenging time in his life in the years leading up to the pandemic and later January 6, 2021. It is also clear that his actions that day were fundamentally out of character with who he is. As described above, Mr. Modrell's nature and characteristics support a sentence of probation.

  **ii.**   **The Nature and Circumstances of Mr. Modrell's Offense Support Probation**

As noted above, Mr. Modrell self-surrendered and took responsibility at the earliest possible opportunity for his decisions and actions on January 6th. After his self-surrender to authorities, Mr. Modrell gave a voluntary interview with FBI investigators, in which he was both cooperative and honest about his actions and what he witnessed that day. While inside the Capitol, Mr. Modrell did not encourage or engage in any violence or property destruction of any kind, nor did he go into any sensitive areas within the Capitol. Rather, he traveled on the Metro to the Capitol from his home in Columbia, Maryland in order to witness former President Trump's speech, and made the regrettable

7

decision to follow the crowd into the Capitol that day. Mr. Modrell did not bring a weapon of any kind to Washington, D.C., nor did he make any threatening or incendiary statements of any kind to officers that day. And in contrast to many of the cases cited by the Government, Mr. Modrell did not post or boast about attending the events on the Capitol before or after the fact.

Rather, as he explained to the FBI investigators, his intention was to go listen to former President Trump speak before he left his role. Once individuals at the speech began to march to the Capitol, he joined in in what he felt to be an expression of hope for the future and First Amendment freedom. From his location a good ways back in the crowd, he recalls that individuals around him were singing the National Anthem and reciting the Pledge of Allegiance. He also recalls that he was stopped with the crowd some distance away from the Capitol, and was unable to see the circumstances leading to the original breach. At some point, the crowd began moving forward again, and Mr. Modrell continued walking toward the Capitol alongside.

While it is true that Mr. Modrell ultimately entered the Capitol through a broken window as many others also continued inside, he did so over 13 minutes after other individuals had initially breached, and could not view the initial breach to understand the severity of the situation ahead. Once inside the Capitol, he was peaceful and calm, taking occasional photos with his phone and walking around, at times even appearing somewhat disoriented.[1] While he was inside the building for approximately twenty minutes, the most extensive interaction he had that day was a brief conversation with Capitol Police officers, during which he asked how to leave the building. Mr. Modrell exited the building peacefully and through an open door. It was only once he began to see the news and talk with family while riding home on the metro that he learned that someone had

---

[1] It is important to note that Mr. Modrell suffers from about 50% hearing loss in his right ear, as well as some hearing loss in his left ear.

been shot and that other acts of violence had occurred that day.

To this end, Counsel strongly disputes the Government's claims that because Mr. Modrell was in "close proximity" to acts of violence such as individuals throwing chairs, he was aware of that violence and elected to remain despite it, and furthermore "minimized" said violence when he spoke with the FBI. Counsel has reviewed the relevant footage provided by the Government, and it appears that Mr. Modrell entered the Crypt Lobby several seconds *after* other protestors had been throwing objects and chairs at Capitol Police Officers.

Counsel requested video footage from the Government which might show another angle and/or location to demonstrate this, but was told that it does not exist. While the Government points out that this violence took place "for about 30 seconds," it is irrelevant to Mr. Modrell's actions as he arrived in this area *after* these events had already taken place. During the 30 seconds of violence, Mr. Modrell was not yet in the Crypt Lobby, which is confirmed by the fact that he is not seen in any footage, neither CCTV nor other, when this occurred, and described in more detail below. When Mr. Modrell arrived in the area (and is first seen in footage), the last chair had already been thrown. At that time, some protestors were beginning to chase the officers down the stairs, but Mr. Modrell would not have been in a position to see this from where he was standing.

The Government included the following screenshot (Exhibit #2 on p.8 of Gov't Sentencing Memorandum) which accurately shows the moment that Mr. Modrell is first seen in any crypt lobby CCTV footage. They also circled a man who had sprayed officers with a chemical irritant and pointed out that Mr. Modrell was approximately 15ft away from this man:

9



However, the Government omitted the fact that this man had sprayed the irritant eight seconds prior to when Mr. Modrell arrived. Furthermore, when the man did spray the irritant, the fire door was partially closed. Only those people inside the lobby (and standing near to the man at the moment) would have been able to see both the man's actions and also the officers who had already begun retreating.

The image below (left-side) shows the man spraying in the direction of the retreating officers at 2:29:53pm, eight seconds *prior* to when Modrell was first seen in the lobby. Note that even when the fire door begins to open, and the crowd behind the man become visible (right side image below at 2:30:00pm), Mr. Modrell is still not yet seen in footage. There is simply no evidence to show that Mr. Modrell was anywhere near this man when the chemical irritant was deployed.

10

 

*7206 USCS 01 Crypt Lobby East - 2021-01-06_19h19min01s.mp4*

The Government also included the following screenshot (image below is Exhibit #3 on p.8 of Gov't sentencing memorandum) which is taken from a different defendant's mobile device. Again, they accurately pinpoint the first moment that Mr. Modrell is seen in this video footage. He is walking into the Crypt Lobby with the crowd and approaching the area where the violence had previously occurred.



However, the Government failed to indicate the location of the stairs where the protestors (now finished throwing chairs) were chasing the officers. The image below is the same image from Gov't Exhibit #3 (above) with orange arrow (added by defense) to show the general area of the stairs, noting that even the stairs are not visible from where the video is being recorded. Aside from being several rows of people away from the incident, the protestors and officers were on a staircase leading down. They would not have been visible to Mr. Modrell.

11



The Government admits that the chairs were thrown four seconds prior to when Mr. Modrell arrived. They also admit that the officers had already begun retreating at this time.[2] The following screenshot shows the last chair being thrown, four seconds *prior* to Mr. Modrell's arrival. Mr. Modrell is not seen in the footage because he simply hadn't arrived yet. When the camera panned back around four seconds later, Mr. Modrell is just walking in.



---

[2] Page 7, ¶2 of Gov't SM: "*Four seconds before Modrell appears in the video in Exhibit # 3, another rioter at the top of the stairs threw yet another chair down the stairs towards the retreating Capitol Police officers.*"

In short, the Government is accusing Mr. Modrell of witnessing violence based on proximity, and of minimizing that violence. But proximity is only a valid argument if the timing also aligns, i.e. if they were there at the same time that the incident occurred. Given the dense crowd and the complex layout of this area of the capitol (pillars, moving doorways, multiple rooms and staircases), a delay of four seconds is more than enough time to have prevented Mr. Modrell from witnessing the violence against law enforcement (which in fact it did).[3]

Lastly, it is important to address the comparator cases the Government raised in its sentencing memorandum to justify a sentence of incarceration. First, the only commonality between the conduct of the defendant in *United States v. Dawn Munn*, 21-cr-00474, and the conduct of Mr. Modrell, is identified by the government–both Mr. Modrell and defendant Munn entered the U.S. Capitol building through a broken window near the Senate Wing doors at around 2:26 p.m.[4]  Beyond this superficial similarity, the behavior of defendant Munn and that of Mr. Modrell differ markedly.

While Mr. Modrell entered the Capitol building alone, defendant Munn entered the Capitol with her family, including her son and three daughters.[5] Once defendant Munn entered the Capitol, she and her family observed other individuals physically engaging with law enforcement–defendant Munn even admitted to getting knocked down by a confrontation between an officer and another individual.[6]  Unlike defendant Munn, Mr. Modrell did not participate in any acts of violence or

---

[3] The Government also points out that Mr. Modrell witnessed others attempting to obstruct the moving doorways by blocking them with various objects.  The defense does not dispute this, as these events continued to occur for over a minute after the violence had subsided and law enforcement had left the area.  But there is a significant difference between witnessing others assaulting police and witnessing others putting objects in doorways.
[4] Gov. Sentencing Memo, ECF. No. 32 at 16; *see also United States v. Dawn Munn*, 1:21CR474, Gov. Sentencing Memo, ECF. No. 103 at 2.
[5] *Munn*, 1:21CR474, Gov. Sentencing Memo, ECF. No. 103 at 16.
[6] *Id.* at 2–4 ("I got body checked by coo [sic] and sent flighing [sic]").

13

property destruction within the Capitol building, and has stated that he did not witness any of these acts while inside the Capitol building, with the exception of someone who knocked over a stanchion post.[7]  Mr. Modrell's claim is supported by video evidence, as discussed at length above.[8]

Further, while Mr. Modrell spent approximately 25 minutes in the Capitol building, leaving at 2:51 p.m., defendant Munn, along with her husband and children, spent over 50 minutes inside the Capitol building, leaving at 3:17 p.m.[9]  Finally, while Mr. Modrell has admitted to and taken responsibility for his conduct on January 6, 2021, defendant Munn gave her own conduct a full-throated endorsement: when asked by the FBI, seven months after she had entered the Capitol building, if she would do it all again, defendant Munn replied, "Most definitely."[10]

The government also cites *United States v. Jean Lavin*, 21-cr-00596, as a comparable case to that of Mr. Modrell, but ignores key differences.  Defendant Lavin spent approximately 32 minutes inside of the building, a time period in which she witnessed violence and property destruction, yet nevertheless continued to roam the Capitol.[11]  As defendant Lavin made her way to the Capitol, she saw other individuals shove Metropolitan Police Officers and shout that the officers were "fucking fraud[s]" and "traitors."[12]  After the events of January 6, Lavin showed no remorse, posting on Facebook, "we come for the government officials that are ruining our country," and told the FBI that the use of tear gas served to agitate the otherwise peaceful crowd.[13]  Mr. Modrell did not witness any violence comparable to that seen by defendant Lavin, Mr. Modrell

---

[7] *Id.* at 12.
[8] CCTV from Camera 7206 at 2:30:02.
[9] *Munn*, 1:21CR474, Gov. Sentencing Memo, ECF. No. 103 at 2, 9.
[10] *Id.* at 12–13 (defendant Munn also attempted to evade responsibility for her entry, claiming to have been "guided in" to the Capitol building by a well-dressed man).
[11] *United States v. Jean Lavin*, 1:21CR596, Gov. Sentencing Memo, ECF. No. 103 at 4.
[12] *Id.*
[13] *Id.* at 10, 12.

14

spent less time in the Capitol than defendant Lavin, and, unlike defendant Lavin, Mr. Modrell has not minimized his actions on January 6.

Finally, the government refers to *United States v. Carson Lucard*, 22-cr-00087, as a comparable case.  The government's basis for its comparison is that Mr. Modrell and defendant Lucard spent similar amounts of time in the Capitol building–Mr. Modrell spent 25 minutes inside, while defendant Lucard spent approximately 23 minutes inside.  However, the 23 minutes defendant Lucard spent within the Capitol building are the culmination of two separate entries into the Capitol building.[14]  Additionally, upon his reentry to the building, defendant Lucard entered Senator Jeff Merkley's ransacked personal office, and took pictures of the destruction within.[15] Defendant Lucard's multiple entries into the Capitol, along with his entry into a sensitive area of the Capitol, demonstrate conduct more culpable than that of Mr. Modrell, who only entered the Capitol once, and who did not peruse or photograph any areas as sensitive as a senator's office.

In sum, as described above, the nature and circumstances of Mr. Modrell's non-violent offense counsel in favor of a probationary sentence.

### iii. A probationary sentence will meet the other goals of sentencing.

A probationary sentence will serve as a just punishment and adequate deterrent for Mr. Modrell in this case. Mr. Modrell has already experienced serious consequences for his actions that will continue to reverberate for the rest of his life. Mr. Modrell not only faces the possibility of losing his job and throwing his family's financial stability into turmoil as a result of his actions in this case, but also of potential incarceration and further shame to his family and children if he were to violate his probation–which is more than sufficient to deter Mr. Modrell from ever again breaking the law.

---

[14] *United States v. Lucard*, 1:22CR87, Gov. Sentencing Memo, ECF. No. 21 at 2.
[15] *Id.* at 2.

15

With respect to general deterrence, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[16] In short, there is little empirical support for the prospect that a period of confinement will be any more effective at deterring Mr. Modrell or others from committing this offense. And, indeed, the most effective deterrent is the certainty of punishment, not the severity of punishment. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) ("[G]iven that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques"). Finally, the requested sentence will avoid unwanted disparities with other similarly situated January 6 defendants.

## CONCLUSION

---

[16] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. of Rsch. in Crime and Delinq. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

16

For the foregoing reasons, Mr. Modrell respectfully requests that the Court impose a probationary sentence as recommended by U.S. Probation. However, a fine of the magnitude suggested by probation would be burdensome to Mr. Modrell given the high cost of his children's education and other demands on his household. As such, Counsel respectfully requests that only the restitution as contemplated be imposed.

        Respectfully Submitted,

        A.J. KRAMER
        FEDERAL PUBLIC DFENDER

        _____/s/_____
        Kathryn Guevara
        Attorney to Paul Modrell
        Assistant Federal Public Defender
        Office of the Federal Public Defender for the
        District of Columbia
        625 Indiana Avenue, N.W.
        Washington, D.C. 20004